821 A.2d 1205

The MILTON S. HERSHEY MEDICAL CENTER OF The
PENNSYLVANIA STATE UNIVERSITY, Appellant

v.

COMMONWEALTH of Pennsylvania MEDICAL
PROFESSIONAL LIABILITY CATASTROPHE
LOSS FUND, Appellee.

Supreme Court of Pennsylvania.

Argued Dec. 3, 2002.

Decided April 25, 2003.

James Michael Horne, John A. Snyder, State College, for Milton S. Hershey Medical Center.

Zella Smith Anderson, Tawny K. Mummah; Elit R. Felix, II, Philadelphia, for Pennsylvania Medical Professional Liability Catastrophe Loss Fund.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

**OPINION**

JUSTICE NEWMAN.

The Milton S. Hershey Medical Center of the Pennsylvania State University (HMC) appeals the unanimous determination of the Commonwealth Court, which granted the summary

judgment motion of the Commonwealth of Pennsylvania Medical Professional Liability Catastrophe Loss Fund (the Fund). For the following reasons, we affirm the Order of the Commonwealth Court.

## Facts and Procedural History

The issues in this case arose from the settlement of two medical malpractice actions, an obstetrical malpractice action and a pediatric cardiology action in which the plaintiffs claimed that physician employees of HMC were negligent and that HMC bore vicarious liability.[1] We first discuss the obstetrical malpractice action and then we speak to the pediatric cardiology action.

The obstetrical malpractice action, commenced in July of 1996 in the Court of Common Pleas of Dauphin County. The plaintiffs (mother and child) alleged that a physician employee of HMC provided inappropriate obstetrical care to mother, which caused severe injuries to the child. Mother and child also alleged that HMC was vicariously liable for the harm they suffered. HMC agreed to settle the case. To finance the settlement, HMC tendered $200,000.00 of the physician's primary coverage to the Fund. The tender triggered the Fund to provide the physician's $1,000,000.00 statutory insurance coverage and authorized settlement for $1,200,000.00. The plaintiffs declined to settle for that amount. Notwithstanding that HMC had self-insured $3,000,000.00 of excess insurance for the physician and, in addition to that, a shared private excess layer of $25,000,000.00, it chose not to make payment from its self-insured excess layer. Instead, HMC attempted to tender its own $200,000.00 of primary coverage to the Fund with the apparent expectation that the Fund would then make another $1,000,000.00 available to finance the settlement. However, the Fund declined to make payment on the vicarious liability claims against HMC because it believed that its payment was not implicated until the insurance available to the primarily liable physician was exhausted.

1. HMC stipulated that the claims against it in the medical malpractice actions were based on its vicarious liability only and that it was not subject to direct liability.

The second action, which is the pediatric cardiology action, was commenced in the Court of Common Pleas of Dauphin County in April of 1997. In that case, a child and his parents sued HMC and a pediatric cardiologist employed by HMC because the cardiologist performed a procedure on the child that allegedly caused the child injury. Similar to the obstetrical action, there was neither a claim that HMC committed any overtly negligent act, nor a claim that HMC failed to take action it should have taken. The plaintiffs alleged, instead, that HMC was subject to vicarious liability because the physician was an employee of HMC. To settle the case, HMC tendered the physician's $200,000.00 in primary coverage and the Fund, on behalf of the physician, made $1,000,000.00 in settlement monies available. The plaintiffs declined to settle for $1,200,000.00. Hence, HMC tendered its own $200,000.00 in primary insurance expecting that the Fund would contribute an additional $1,000,000.00. However, the Fund again declined to pay because it claimed that its coverage for HMC was not implicated until the available insurance of the primarily liable physician was exhausted. HMC then used its own funds to make up for the discrepancy between the physician's $1,200,000.00 and the amount necessary to settle the case. It then sued the Fund in Commonwealth Court demanding that the Fund repay HMC the dollar amounts it claimed should have been paid by the Fund.[2]

After denying the Fund's Motion for Judgment on the Pleadings, the Commonwealth Court resolved the issues in both cases on Motions for Summary Judgment and declared that the Fund's coverage for HMC was not implicated where the primarily liable physicians had sufficient insurance to finance the settlements of both actions. In addition to the claim for declaratory relief, the Commonwealth Court also

2. The settlement agreements were filed under seal and we are unaware of the terms of the agreements except to note that HMC requested judgment in the amount of $1,600,000.00, representing a $600,000.00 portion of the amount it paid to settle the obstetrical malpractice action and a $1,000,000.00 portion of the amount it paid to settle the pediatric cardiology action, which it claimed that the Fund should have paid. The Fund does not dispute that the settlement amounts were reasonable.

dismissed seven other causes of action HMC asserted including: violation of the Act, indemnification, subrogation, estoppel, quasi contract, denial of due process and equal protection, and bad faith. The Commonwealth Court disposed of these claims as follows: "In light of the foregoing analysis in favor of the CAT Fund's approach to priority of coverage, this Court need not address HMC's alternate theories of recovery." *Hershey Med. Ctr. v. Commonwealth, Med. Prof'l Liab. Catastrophe Loss Fund,* 778 A.2d 1071, 1079 n. 16 (Pa.Cmwlth.2001) (*HMC II*). First, we address the request for declaratory relief and then we turn to the remaining claims of HMC to assess whether the resolution of the declaratory judgment claim required the dismissal of HMC's other causes of action.

## The Health Care Services Malpractice Act

As a matter of background in this statutory interpretation case, we now turn to a discussion of the Health Care Services Malpractice Act (the Act) and the Medical Professional Liability Catastrophe Loss Fund (the Fund). The General Assembly created the Health Care Services Malpractice Act to "make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation." Section 102 of the Health Care Services Malpractice Act, Act of October 15, 1975, *as amended,* 40 P.S. § 1301.102.[3] To implement these goals, the Act calls for the creation of the Medical Professional Liability Catastrophe Loss Fund. To participate in the Fund, the Act requires health care providers to purchase a minimum amount of primary professional liability insurance coverage. The parties agree that at the time the primary policies were issued in favor of the physicians and HMC, they were required to maintain $200,000.00 in primary insurance per occurrence each. 40 P.S. § 1301.701(a). The Fund pays "settlements . . . against a health care provider . . . to the extent such health

---

**3.** The parties agree that HMC and its physicians are health care providers as that term is defined by the Act.

care provider's share exceeds [this $200,000.00 in] basic coverage in effect at the time of occurrence." 40 P.S. § 1301.701(d). To maintain the Fund, the General Assembly requires health care providers to pay an annual surcharge [4] on the primary insurance premium.[5] 40 P.S. § 1301.701(e). All health care providers are required to contribute to the Fund. Indeed, health care providers who fail to contribute are subject to having their licenses revoked by the licensure board. 40 P.S. § 1301.701(f).

## The Insurance of HMC and its Physicians

An understanding of the levels of insurance coverage HMC obtained for itself and its physician employees is also essential to this case. The best way to conceptualize the layers of insurance is to imagine two columns, each with four layers; the first column showing the insurance HMC obtained for its physicians and the second showing the apparently identical coverage it obtained on its own behalf. The bottom level of each column represents a $200,000.00 self-insured layer of basic coverage. The next level shows the $1,000,000.00 Fund limit of liability. The third layer is a self-insured excess layer of $3,000,000.00. The fourth represents a $25,000,000.00 layer of excess insurance.

Viewing the physicians' column of insurance alongside HMC's column, we consider some preliminary examples demonstrating how coverage is structured in cases in which a plaintiff sues an HMC physician and asserts that HMC is vicariously liable. We first consider a situation in which the

---

**4.** Pursuant to 40 P.S. § 1301.701,

> The fund shall be funded by the levying of an annual surcharge on or after January 1 of each year on all health care providers entitled to participate in the fund.... The surcharge shall be based on the prevailing primary premium for each health care provider for maintenance of professional liability insurance and shall be the appropriate percentage thereof, necessary to produce an amount sufficient to reimburse the fund for the payment of final claims and expenses incurred during the preceding claims period and to provide an amount necessary to maintain and additional 15% of the final claims and expenses incurred during the preceding claims period.

**5.** There is no dispute that HMC paid surcharges for itself and on behalf of its physician employees.

parties settle for $200,000.00. Such a settlement would indisputably not require recourse to HMC's column of insurance because the primarily liable physician has sufficient insurance coverage to finance the settlement. Similarly, a case with a settlement value of $1,200,000.00 would also not require monies from HMC's column of coverage because the payment from the physician's first layer plus the full amount of the physician's statutory coverage would satisfy the claim. A claim greater than $1,200,000.00 but less than $1,400,000.00 would also not raise the issue in this case because, regardless of whether the additional $200,000.00 comes from the physician's self-insured excess layer or HMC's self-insured primary layer of coverage, the resources for the settlement would come from HMC.

The issue arises where, as here, the settlement amounts in the underlying medical malpractice actions were each in excess of $1,400,000.00. A settlement in excess of $1,400,000.00 requires a determination of whether settlement amounts must be paid from the third level of the physician's column, the level representing $3,000,000.00 in self-insured excess coverage, or the second level of HMC's insurance column, representing the statutory coverage of HMC. The Fund contends that the additional settlement funds should come from the physician's excess insurance layer and HMC contends that they should come from the second layer of HMC's column.

### Discussion

■ Both parties posit that 40 P.S. § 1301.705(a) supplies the necessary authority for their respective positions. At all times relevant to this action, section 1301.705(a) provided:

No insurer providing excess professional liability insurance to any health care provider eligible for coverage under the fund shall be liable for payment of any claim against a health care provider for any loss or damages except those in excess of the fund coverage limits.

40 P.S. § 1301.705(a). HMC interprets the statute to mean that no excess insurance may be paid until the Fund pays $2,000,000.00, its statutory maximum for the physician and the

hospital. HMC refers this Court to the use of the word "any" and argues that it refers to both of the two categories of health care providers, the physicians and the hospital. HMC reasons that the words "no insurer providing excess professional liability insurance to any health care provider ... shall be liable for payment of any claim against a health care provider for any loss or damages except those in excess of the fund coverage limits" means that HMC need not make payment out of its self-insured excess layer until the Fund pays its statutory insurance on behalf of *both* the physicians and HMC.

The Fund maintains that Section 1301.705(a) provides that an excess insurer of the physician health care provider need not make payment unless the loss exceeds the Fund coverage limits for that provider. In the underlying cases, the Fund argued that its payment of the limits of the physicians' coverage satisfied the requirement of Section 1301.705. The Fund further asserts that the self-insured excess coverage of HMC is triggered because the amount of the loss exceeds the fund coverage limits for the physicians. Consequently, the Fund submits that Section 1301.705(a) authorizes it to require HMC to exhaust the insurance coverage available to the physicians before the Fund is required to accept the tender of HMC.

### Declaratory Relief

HMC requested declaratory relief to resolve the parties' conflicting interpretations of the Act and its application to the parties. We believe that both parties have read too much into the statute. Contrary to the position of HMC the statute does not prohibit the Fund from requiring HMC to exhaust the physicians' coverage. A fair interpretation of the statute is that the excess carrier for any particular health care provider need not make payment unless the loss exceeds the Fund's coverage limits for that provider. However, contrary to the Fund's interpretation, the statute also does not expressly grant the Fund leave to deem coverage of HMC not implicated until exhaustion of the physician's coverage.

■ Accordingly, we believe the statute is ambiguous regarding the issue of whether the Fund should be required to make the additional $1,000,000.00 payments to HMC as a result of the vicarious liability claims asserted against it. Where a statute is ambiguous, we are guided by rules of statutory construction to determine the intent of the General Assembly. As we have often observed, "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). Furthermore, 1 Pa.C.S. § 1921(c) provides:

When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: (1) The occasion and necessity for the statute. (2) The circumstances underwhich it was enacted. (3) The mischief to be remedied. (4) The object to be attained. (5) The former law, if any, including other statutes upon the same or similar subjects. (6) The consequences of a particular interpretation. (7) The contemporaneous legislative history. (8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921(c).

To ascertain the intent of the legislature, we now discuss the occasion and necessity for the statute, the circumstances under which it was enacted, the mischief to be remedied, and the object to be attained. The General Assembly enacted the Health Care Services Malpractice Act in October of 1975 in response to a crisis in the field of medical malpractice insurance marked by dramatic increases in the cost of insurance and the specter of its unavailability. *American Cas. Co. of Reading, PA v. PHICO Insurance Co.*, 537 Pa. 295, 643 A.2d 91, 98 (1994)[6] (citing *McCoy v. Bd. of Med. Educ. and Licensure*, 37 Pa.Cmwlth. 530, 391 A.2d 723, 725 (1978)). We explained that:

**6.** HMC relies upon dicta in *American Casualty* to support its contention that the Fund should have paid an additional $1,000,000.00 based upon the vicarious liability claim against HMC. *American Casualty,* 643 A.2d at 93. However, *American Casualty* is distinguishable because it involved claims of direct liability against the hospital in addition to vicarious liability claims.

The Pennsylvania General Assembly responded to this "crisis" by enacting the [Health Care Services Malpractice] Act. Its stated purpose is "to make available professional liability insurance at a reasonable cost...." It implements this policy by ... limiting the dollar amount of liability insurers on individual awards. This limitation is achieved by the creation of a "Medical Professional Liability Catastrophe Loss Fund" [hereinafter referred to as the Fund], established by a surcharge on insurance premiums.... The Fund is guaranteed by requiring that all health care providers as defined by the Act either purchase insurance or develop a plan of self-insurance....

*American Casualty,* 643 A.2d at 98 (quoting *McCoy,* 391 A.2d at 725–726. (internal citations omitted)).

During debate in the Pennsylvania House of Representatives, Rep. Berson, one of the bill's sponsors, described the mechanics of the Fund as follows:

Each year each health care provider as defined in House bill No. 1367 would be required to produce proof that he has professional liability insurance.... There would then be an assessment of up to 10 percent on his medical malpractice premium with the aim of producing as quickly as possible a fund...[.] That fund will be available to pay any claims or awards above ... the basic medical malpractice insurance policy carried by the health care provider....

Our purpose in doing this is our belief that such an arrangement will produce a reduction in medical malpractice rates.

*American Casualty,* 643 A.2d at 98 (quoting *Legislative Journal—House* 2281 (July 21, 1975) (Remarks of Rep. Berson)).

According to this legislative history, the purpose of the Health Care Services Malpractice Act was to reduce the cost of primary insurance rates by creating a fund to pay claims that are more than "the basic medical malpractice insurance policy carried by a health care provider." *American Casualty,* 643 A.2d at 98. The General Assembly financed the Fund by requiring all health care providers to obtain a minimum level of insurance and assessing a fee on every medical

malpractice insurance premium procured in the Common-wealth.

The approach favored by HMC would minimize exposure of the physician's *excess* carrier, require the payment of both the primary insurance coverage for the physician and the primary insurance for HMC, and trigger, in each case, a second additional $1,000,000.00 payment by the Fund. The position of HMC is, therefore, inconsistent with the stated policy of the Fund to reduce the cost of *primary* insurance coverage and maintain the solvency of the Fund. Indeed, if these cases were resolved in the manner HMC favors, in addition to the payment of the physicians' primary insurance of up to $200,000.00 in the obstetrical malpractice action and $200,000.00 in the cardiology action, HMC's $200,000.00 of primary coverage in both actions would have to be paid, and the Fund would be depleted by an additional $1,000,000.00 for each of the doctors and by a secondary $1,000,000.00 for each claim against HMC. If we accept the position of HMC, additional primary insurance must be paid and the Fund must be depleted twice for each claim against the primarily liable doctor and vicariously liable hospital. The result would be an increase in the cost of primary insurance and an increase in the assessment on health care providers needed to finance the Fund.

The approach of HMC only favors HMC; it does not advance the goals of the statute. It also depletes the Fund and thereby reduces the amount of money available to other medical malpractice victims. In contrast, the position of the Fund would require the payment of the physicians' primary insurance and a payment of the physicians' $1,000,000.00 statutory coverage by the Fund, but it would not require the Fund to make an additional $1,000,000.00 in payments on behalf of HMC. Accordingly, between the position of HMC and the position of the Fund, the position of the Fund is more consistent with the purposes of the statute, which are to reduce primary insurance rates and to preserve the financial integrity of the Fund.[7]

7. Section 1301.705 was repealed and amended by the Act of March 20, 2002, P.L. 154, No. 13, as Section 711(h) of the Medical Care Availabili-

■ We now address the principle of vicarious liability and the determination of the Commonwealth Court that it supports the interpretation of the Fund. To prevent an injured plaintiff from being uncompensated, vicarious liability permits recovery from a principal for the negligence of his agent. Both parties refer this Court to the discussion of vicarious liability in *Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380 (1989) and contend that it supports their respective positions. In *Mamalis*, we affirmed the determination of the Superior Court and its distinction between joint liability and vicarious liability. We quoted its description of the concept of vicarious liability as follows:

> The rules of vicarious liability respond to a specific need in the law of torts: how to fully compensate an injury caused by the act of a single tortfeasor. Upon a showing of agency, vicarious liability increases the likelihood that an injury will be compensated, by providing two funds from which a plaintiff may recover. If the ultimately responsible agent is unavailable or lacks the ability to pay, the innocent victim has recourse against the principal. If the agent is available or has means to pay, invocation of the doctrine is unneces-

ty and Reduction of Error (MCARE) Act, 40 P.S. 1303.711(h), to read as follows:

Medical professional liability insurance
\* \* \* \*

(h) Excess Insurance.—
  (1) No insurer providing medical professional liability insurance with liability limits in excess of the fund's liability limits to a participating health care provider shall be liable for payment of a claim against the participating health care provider for a loss or damages in a medical professional liability action except the losses and damages in excess of the fund coverage limits.
40 P.S. 1303.711(h). Although the terms of Section 1301.705 govern the rights of the parties and one cannot be certain that the General Assembly intended to clarify the provision, its amendment may offer some guidance as to its drafter's original meaning. The provisions of the revised statute remove the references to "any health care provider" and "any claim" upon which HMC relies and replaces them with the terms "a participating health care provider" and "a claim against the participating health care provider." *Compare* Section 1301.705 *with* Section 1303.711(h). This amendment, if deemed a clarification, would support the Fund's interpretation that the excess carrier for the physician is subject to liability once the claim against that health care provider exceeds the Fund's coverage limits for that health care.

sary because the injured party has a fund from which to recover.

*Mamalis*, 560 A.2d at 1383 (quoting *Mamalis v. Atlas Van Lines, Inc.*, 364 Pa.Super. 360, 528 A.2d 198 (1987)).

In this case, there was no dispute that HMC was vicariously liable for the negligence of the physicians it employed. The insurance coverage of the physicians was sufficient to satisfy the claims of the plaintiffs. Once we accept, as we do, that the purpose of vicarious liability is to provide a secondary fund of recovery, it is clear that there is no need to resort to the insurance of the vicariously liable defendant where the primarily liable defendant has sufficient coverage to satisfy the claim. That is not to say that a plaintiff may not sue both a primarily liable defendant and a vicariously liable defendant and obtain a recovery from either; he may. The issue in this case, though, is one of attribution of responsibility to finance the settlement as between the primarily liable defendant and the vicariously liable defendant.[8] Where, as here, the insurance coverage for the physicians was sufficient to satisfy the claims, their coverage should finance the settlement; there is no reason to utilize the insurance coverage of the vicariously liable hospital. Accordingly, the Fund's coverage of the vicarious claims against HMC was not implicated because the physicians' coverage was sufficient to satisfy the claims.[9]

8. HMC argues that because a vicariously liable employer cannot properly demand that a plaintiff first determine that the primarily liable employee has insufficient assets before suing the employer, it follows that the Fund cannot require HMC to exhaust the insurance of the primarily liable physicians. Although the premise of HMC is correct, we cannot accept its conclusion. The issue in this case is whether HMC paid more than its share in a settlement, not whether the plaintiffs had the right to seek compensation from both HMC and its physicians. Just because a plaintiff may seek recovery from the principal and an agent, it does not mean that the principal may not seek indemnity from the agent and his or her insurer.

9. The Commonwealth Court based its determination, in part, upon deference to the opinion of the Director of the Fund. Because we believe that sufficient indicia of the intent of the legislature exists and that intent is consistent with the principle of vicarious liability, we decline to base our determination on deference to the administrative agency.

### Remaining Claims of HMC

As we previously noted, in addition to the request for declaratory relief, HMC asserted the following causes of action: violation of the Act, indemnification, subrogation, estoppel, quasi contract, denial of due process and equal protection, and bad faith. Based upon our review of the complaint and the Opinion of the Commonwealth Court, it is clear that the determination that the Fund properly declined to make payment until the exhaustion of the insurance of the primarily liable physicians established that the Fund did not wrongfully withhold payment. HMC's causes of action based on the Act as well as its indemnification, subrogation, constitutional [10] and bad faith claims were predicated explicitly or implicitly on its allegation that the Fund violated the Act by wrongfully withholding payment. Because our statutory analysis establishes that the Act permitted the Fund to withhold payment, we agree with the determination of the Commonwealth Court that its decision to grant declaratory judgment permitted the dismissal of HMC's claim that the Fund violated the Act as well as HMC's indemnification, subrogation, constitutional and bad faith claims.

However, we are unable to affirm the dismissal of the estoppel and quasi contract causes of action because the Commonwealth Court did not fully explain why the grant of declaratory relief requires their dismissal. In those causes of action, HMC averred that the Fund's policy of declining to pay vicarious liability claims until the insurance of the primarily liable physician was exhausted was "recently asserted" and that it had reasonably relied upon the agency's prior conduct when it made its excess insurance decisions. The Commonwealth Court deemed these claims legally sufficient to overcome preliminary objections asserted by the Fund. *See*

10. While the crux of HMC's due process argument is based upon HMC's allegation that the Fund violated the Act, HMC does claim that it had a reasonable expectation that the Fund would make payment on behalf of HMC. While this sub-claim is not based on the language of the Act, these proceedings have provided HMC with its notice and opportunity to be heard. Therefore, HMC has been afforded all the process that is conceivably due.

*Hershey Med. Ctr. v. Commonwealth, Med. Prof'l Liab. Catastrophe Loss Fund,* 763 A.2d 945, 950–51 (Pa.Cmwlth.2000). Moreover, the Fund's denials, addressed to the relevant averments of the complaint, appear to have implicated factual questions, because the Fund specifically denied that its policy was "recently asserted," and instead contended that its position "is and always has been that all available coverage on a directly liable health care provider must be exhausted before the Fund will contribute toward settlement on behalf of a health care provider who is solely vicariously liable." *HMC II,* 788 A.2d at 1077.

The Commonwealth Court did not explain how affirmation of the validity of the Fund's present approach to the payment of claims based on vicarious liability awards eliminates the estoppel claim or the quasi contract claim predicated on asserted, previous conduct. Indeed, this Court has explained that there are some circumstances in which an agency's previous actions may serve as the basis for estoppel, even where such actions violated positive law. *See Chester Extended Care Ctr. v. Commonwealth, Dep't of Pub. Welfare,* 526 Pa. 350, 586 A.2d 379, 383 (1990). Because we are unable to resolve the estoppel and quasi contract claims, we remand those claims to the Commonwealth Court with instructions to either: explain why it believes the claims should be dismissed or conduct further proceedings.

The remainder of the Order of the Commonwealth Court is affirmed. As a result, declaratory relief is granted in favor of the Fund and HMC's causes of action based on the Act as well as its indemnification, subrogation, constitutional, and bad faith claims are dismissed.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice NIGRO files a concurring opinion.

JUSTICE NIGRO, CONCURRING.

In *Mamalis v. Atlas Van Lines, Inc.,* this Court stated that vicarious liability is designed to afford a plaintiff an alternative

source of recovery in the event that the party that is directly liable for the plaintiff's injury is unavailable or lacks the ability to pay. 522 Pa. 214, 560 A.2d 1380, 1383 (1989) (quoting *Mamalis v. Atlas Van Lines, Inc.,* 364 Pa.Super. 360, 528 A.2d 198 (1987)). As such, I agree with the majority that once a medical malpractice plaintiff chooses to recover from a directly liable physician, that physician's insurance coverage must be exhausted before tapping into the CAT Fund coverage for a vicariously liable hospital, which has itself engaged in no culpable conduct.

Here, the directly liable physicians have more than enough insurance coverage to satisfy the damages occasioned by their negligence. Each physician's coverage consists of not only his $200,000 in basic coverage and $1,000,000 in CAT Fund coverage, but also a $3,000,000 layer of self-insured excess coverage, which is funded by none other than the vicariously liable hospital, Appellant The Milton S. Hershey Medical Center of the Pennsylvania State University ("HMC"). Presumably, HMC would have no practical objection to exhausting the physicians' coverage had it not chosen to provide the self-insured excess to its physicians. However, in light of its exposure in this case, it is now arguing that rather than tap the physicians' excess coverage, recovery should first be had from HMC's own privately-purchased basic and CAT Fund coverage. In support of this contention, HMC relies on section 1301.705 of the Health Care Services Malpractice Act, 40 P.S. § 1301.705(a). Unlike the parties here, however, I simply do not read section 1301.705(a) as addressing the priority of coverage between directly liable and vicariously liable parties. In my view, section 1301.705 merely makes clear that a provider's CAT Fund coverage must be exhausted before its excess carrier will be liable for payment of a claim against that provider.

Accordingly, in this case, under the logic of *Mamalis,* the physicians' coverage, including the self-insured excess, must be exhausted before the CAT Fund can be made to pay on behalf of HMC. Significantly, HMC made the business decision not only to provide the physicians with excess coverage,

but also to self-insure the first $3,000,000 layer. This left it with significant exposure. It cannot now minimize that exposure by demanding that the CAT Fund contribute in each case a second $1,000,000 in coverage for HMC's vicarious liability, when, by HMC's own design, the directly liable physicians have more than adequate coverage of their own.