670 A.2d 646

Kathleen A. BUTTERFIELD (Now Estate of Kathleen
A. Butterfield, Deceased), Appellant,

v.

Robert L. GIUNTOLI, M.D., Alan Rubin, M.D., John J. Mikuta,
M.D., Trustees of the Hospital of the University of Pennsylva-
nia, Guy Benrubi, M.D., Stephen C. Rubin, M.D., Lexington
Insurance Co., Appellees.

Superior Court of Pennsylvania.

Argued Sept. 12, 1995.

Filed Dec. 7, 1995.

Reargument Denied Feb. 20, 1996.

2

4

---

David Perry, Philadelphia, for appellant.

Melvin R. Shuster, Philadelphia, for Lexington Insurance Company, appellee.

Daniel F. Ryan, III, Plymouth Meeting, for Com. of PA Medical Professional Liability Catastrophe Loss Fund, amicus curiae.

Before KELLY, FORD ELLIOTT and OLSZEWSKI, JJ.

KELLY, Judge.

In this appeal we must determine whether the trial court properly granted summary judgment in favor of appellee, Lexington Insurance Company ("Lexington"), pursuant to the garnishment action brought by appellant-assignee, Estate of Kathleen A. Butterfield ("Butterfield"). Specifically, we must decide whether the instant insurance policy covered punitive damages in view of a Punitive Damages Amendatory Endorsement. In addition, we must determine whether punitive damages assessed on vicarious liability are insurable as a matter of law. For the reasons set forth below, we hold that the trial court erred in placing the burden of proof on assignee Butterfield and granting summary judgment in favor of Lexington. Accordingly, we reverse and remand for proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

This appeal arises from appellant Butterfield's efforts to collect a portion of the punitive damages awarded in the underlying medical malpractice action against the Hospital of the University of Pennsylvania ("HUP") and four physicians employed by HUP. HUP is a wholly owned and controlled separate legal entity of the Trustees of the University of Pennsylvania ("Trustees"), the named insured under the Lexington umbrella insurance policy. Lexington is the second level excess insurance carrier for the Trustees, HUP, and its physicians.

In the underlying action, plaintiff Kathleen A. Butterfield brought suit against HUP and four of its physicians for damages arising from drug-induced leukemia. Miss Butterfield's illness and subsequent death resulted from an extended course of chemotherapy with the experimental drug Alkeran

during her treatment at HUP for ovarian cancer. Miss Butterfield died while her action was pending, and her estate successfully litigated the claim to conclusion.

During the relevant time periods, the Trustees, HUP, and each of the defendant doctors carried $100,000 in primary professional liability insurance coverage with the Insurance Company of North America ("INA"), $1 million in first level excess monetary coverage with the Medical Professional Liability Catastrophe Loss Fund ("CAT Fund"), and $10 million in second level excess insurance coverage with Lexington. Approximately six months prior to trial in a letter dated May 18, 1984, Lexington wrote to Johnson & Higgins, Lexington's insurance broker, advising that it was Lexington's position that it is against public policy in Pennsylvania to insure for punitive damages and that, therefore, under the Lexington policy there would be no coverage for the punitive damages claim. In a letter dated July 13, 1984, Johnson & Higgins responded:

> As you know, the insuring agreement is broad enough to include punitive damages, and they are not excluded. In Pennsylvania, vicariously assessed punitive damages are insurable. So we take exception to the way your position is worded.

Pursuant to the terms of the respective policies, Lexington had the right to participate with the insured in the defense and control of the underlying suit. The pertinent policy provision provides:

> V. Settlement and Defense
>
> ... the Company, at its option but not being required to, shall have the right and be given the opportunity to associate with the insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding....

An attorney from the law firm representing Lexington's interests was present in the courtroom every day during the two-

week trial in November, 1984.[1] Additionally, counsel representing Lexington's interests regularly contacted the defense attorneys handling the case. (Argument on Lexington's Preliminary Motions, September 26, 1985, at 7–8).

In the trial court's charge to the jury, the Honorable Curtis C. Carson instructed that the jury could find HUP either directly negligent, vicariously negligent, or both, in the diagnosis, treatment, or care of Kathleen Butterfield. None of the participants objected to the jury instructions, nor did any of the participants request specific interrogatories to determine whether the jury assessed liability to HUP directly, vicariously, or both. The jury returned a verdict for Butterfield in the amount of $5.5 million, of which $2 million was a lump-sum award for compensatory damages. In addition, the jury awarded $3.5 million in punitive damages apportioned between defendants HUP and the four physicians according to the jury's assessment of negligence as follows:

| Defendant | Percent of Negligence | Amount of Punitive Damages |
|---|---|---|
| HUP | 50% | $1,750,000 |
| Dr. Mikuta | 30% | 1,050,000 |
| Dr. Giuntoli | 15% | 525,000 |
| Dr. Rubin | 3% | 105,000 |
| Dr. Benrubi | 2% | 70,000 |
| Totals: | 100% | $3,500,000 |

On March 1, 1985, the trial court approved an Agreement and Order between the parties agreeing to settle the case. The trial court entered judgment in favor of Butterfield and against all of the defendants for compensation, delay, and punitive damages as follows:

| Defendant | Compensatory | Delay | Punitive | Total |
|---|---|---|---|---|
| Trustees | $1,000,000 | $105,753.43 | $1,750,000 | $2,855,753.43 |

1. Counsel at oral argument submitted that the Honorable Curtis C. Carson permitted counsel for Lexington to attend all conferences in chambers at trial.

8

| (for HUP) | | | | |
|---|---|---|---|---|
| Dr. Mikuta | 600,000 | 63,452.06 | 1,050,000 | 1,713,452.06 |
| Dr. Giuntoli | 300,000 | 31,726.03 | 525,000 | 856,726.03 |
| Dr. Rubin | 60,000 | 6,345.21 | 105,000 | 171,345.21 |
| Dr. Benrubi | 40,000 | 4,230.14 | 70,000 | 114,230.14 |
| | | | | |
| Totals: | $2,000,000 | $211,506.87 | $3,500,000 | $5,711,506.87 |

The Agreement provided that the Trustees would pay $450,-761.85 in compensatory and delay damages and $875,000 in punitive damages on behalf of HUP and the four physicians, and that the CAT Fund would pay $1,760,745 in compensatory and delay damages on behalf of HUP and Drs. Mikuta and Giuntoli. An attorney representing Lexington attended the initial settlement meeting on December 3, 1984. Lexington, however, subsequently refused to indemnify the Trustees. The Trustees and the CAT Fund then assigned to Butterfield any claims they may have against Lexington under Lexington's umbrella insurance policy, which is the subject of this garnishment action.[2]

On April 19, 1985, Butterfield filed a writ of execution to garnish and execute upon the Butterfield judgment debt.[3] On

2. On March 1, 1985, the same day that the Agreement and Order was approved by the trial court, Lexington filed an action in the Eastern District of Pennsylvania, *Lexington v. Trustees of the University of Pennsylvania and the Estate of Kathleen Butterfield*, No. 85–1125, alleging, *inter alia*, fraudulent conduct on the part of the Trustees and Butterfield in entering into the Agreement and Order. Lexington later joined the CAT Fund as an additional defendant from whom Lexington sought damages for failing to settle within the Fund's statutory limits of coverage. In November of 1986, the Trustees and Butterfield filed a second action in the Philadelphia Court of Common Pleas, *Butterfield, et al. v. Lexington Insurance Company*, alleging, *inter alia*, fraud in the inducement against Lexington. That case was removed to the Federal District Court, No. 86–7407, where all federal litigation was subsequently stayed pending the conclusion of the instant garnishment action. (Appellant's Brief at 8).

3. Butterfield is asking for $1,755,753.43 plus interest, costs and fees. This figure represents the difference between the $2,855,753.43 judgment against the Trustees and the $1,100,000.00 advanced by the Trustees' underlying insurance coverage. Pursuant to the assignment agreement, the Trustees reserved the right to recover a significant

May 13, 1985, Lexington filed preliminary objections. In an opinion and order entered November 30, 1987, the trial court dismissed Lexington's preliminary objections and directed Lexington to answer the Butterfield interrogatories. Following discovery, the parties agreed to submit this case to the trial court on cross motions for summary judgment. The Honorable Abraham J. Gafni held that Butterfield could not meet its burden of proof on the issue of whether the Lexington policy covered the punitive damages granted against HUP because Butterfield could not show whether the damages were assessed vicariously, for which there may be coverage under Pennsylvania law, or whether the damages were assessed directly, for which coverage is precluded. Therefore, the court denied Butterfield's motion for summary judgment and entered judgment for Lexington on June 15, 1994. This timely appeal followed.

Butterfield raises the following issues for our review:

1. DID THE LOWER COURT COMMIT REVERSIBLE ERROR BY FAILING TO APPLY THE BURDEN OF PROOF TEST SET FORTH IN *RYAN V. FUREY,* 437 PA. 96, 262 A.2D 305 (1970) AND *BIANCO V. CONCEPTS "100", INC.,* 291 PA.SUPER. 458, 436 A.2D 206 (1981) THAT IS, REQUIRING THE INSURED/GARNISHOR (APPELLANTS) TO PROVE THE EXISTENCE OF A JUDGMENT AND THE EXISTENCE OF A VALID POLICY OF LIABILITY INSURANCE COMPANY [SIC] COVERING THE CLAIM, AND THEN SHIFTING THE BURDEN OF PROOF TO THE INSURER/GARNISHEE (APPELLEE) WHO ATTEMPTS TO EVADE LIABILITY THROUGH AN AFFIRMATIVE DEFENSE?

2. DOES THE INSURER/GARNISHEE (LEXINGTON) HAVE THE BURDEN TO PROVE THAT PUNITIVE DAMAGES HAVE BEEN DIRECTLY RATHER THAN VICARIOUSLY IMPOSED WHEN THE INSURER ATTEMPTS TO RELY ON THE AFFIRMA-

portion of the funds advanced to Butterfield provided Butterfield was successful in its garnishment action against Lexington.

TIVE DEFENSE THAT PUNITIVE DAMAGES WERE DIRECTLY IMPOSED AND THAT INSURING THEM IS "AGAINST PUBLIC POLICY"?

3. IS A PARENT ENTITY WHO IS FINANCIALLY RESPONSIBLE FOR A JUDGMENT ENTERED AGAINST ITS SUBSIDIARY VICARIOUSLY LIABLE AS A MATTER OF LAW, WHEN SUCH PARENT ENTITY WAS NOT NAMED AS A DEFENDANT AND THE JURY VERDICT WAS AWARDED AGAINST THE SUBSIDIARY?

4. IS THE MEDICAL LIABILITY COVERAGE PROVIDED BY THE MEDICAL PROFESSIONAL LIABILITY CATASTROPHE LOSS FUND ("CAT FUND") AN INSURANCE POLICY?[4]

Butterfield's Brief at 4.[5]

## II. STANDARD OF REVIEW

The standard of appellate review of a grant of summary judgment states that summary judgment is properly entered where the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits demonstrate that no genuine, triable issue of fact exists and that the moving party is entitled to judgment as a matter of law. Pa.R.Civ.P. 1035(b); *Cosmas v. Bloomingdales Bros., Inc.*, 442 Pa.Super. 476, 480, 660 A.2d 83, 85 (1995) (citation omitted); *Aetna Casualty and Surety Company v. Roe*, 437 Pa.Super. 414, 419–20, 650 A.2d 94, 97 (1994) (citations omitted); *Accu–Weather, Inc. v. Prospect Communications, Inc.*, 435 Pa.Super. 93, 98–99, 644 A.2d 1251, 1254 (1994) (citation omitted); *Stidham v. Millvale Sportsmen's Club*, 421 Pa.Super. 548, 558, 618 A.2d 945, 950 (1992), *allocatur denied*, 536 Pa. 630, 637 A.2d 290 (1993) (citation omitted). The court must examine the record in the light most favorable to the non-moving party

4. Although the CAT Fund is not a party to this garnishment action, it has filed a brief *amicus curiae* on this issue. For a discussion of this issue, *see infra* at 17–18.

5. As a preliminary matter, we note that Butterfield's brief is thirteen pages over the limit prescribed by Pa.R.App.P. 2135(a), and their reply brief is ten pages over the limit prescribed by Pa.R.App.P. 2135(a).

and resolve all doubts against the moving party. *Aetna Casualty and Surety Company v. Roe, supra; Accu-Weather v. Prospect Communications, supra; Stidham v. Millvale Sportsmen's Club, supra.* Moreover, the burden is on the moving party to prove that no genuine issue of material fact exists. *Accu-Weather v. Prospect Communications, supra* (citing *Overly v. Kass,* 382 Pa.Super. 108, 111, 554 A.2d 970, 972 (1989)). Whether a claim is within a policy's coverage or barred . by an exclusion is a question of law that may be decided by a motion for summary judgment. *Ryan Homes, Inc. v. Home Indemnity Company,* 436 Pa.Super. 342, 346, 647 A.2d 939, 940–41 (1994), *allocatur denied,* 540 Pa. 621, 657 A.2d 491 (1995) (citing *Solcar Equipment Leasing Corporation v. Pennsylvania Manufacturers' Association Insurance Company,* 414 Pa.Super. 110, 120, 606 A.2d 522, 527 (1992)); *Creed v. Allstate Insurance Company,* 365 Pa.Super. 136, 140, 529 A.2d 10, 12 (1987), *allocatur denied,* 517 Pa. 616, 538 A.2d 499 (1988) (citations omitted). We are not bound by the trial court's conclusions of law, but may draw our own inferences and reach our own conclusions. *See Dauphin Deposit Trust Company v. World Mutual Health and Accident Insurance Company of Pennsylvania,* 206 Pa.Super. 406, 409, 213 A.2d 116, 117 (1965) (reversing trial court's erroneous holding that insured had burden of proving that her sickness commenced after effective date of policies). We will reverse a grant of summary judgment only when the trial court has committed an error of law or abused its discretion. *Cosmas v. Bloomingdales Bros., Inc., supra; Aetna Casualty and Surety Company v. Roe, supra* (citations omitted); *Accu-Weather v. Prospect Communications, supra* (citing *Kelly by Kelly v. Ickes,* 427 Pa.Super. 542, 547, 629 A.2d 1002, 1004 (1993)).

Butterfield contends that the trial court erred in granting summary judgment in favor of Lexington because once Butterfield proved the existence of a valid judgment and an insurance policy which covered the claim, Butterfield argues that the burden shifted to Lexington to prove that the claim was excluded. In addition, Butterfield maintains that a genuine issue of material fact remains as to whether the jury

12

awarded punitive damages based on direct or vicarious liability. Therefore, Butterfield asserts, Lexington has not met its burden of proof. We agree.

■ Initially, we note that garnishment is a well-settled, viable remedy available to a judgment creditor to collect on a judgment from the judgment debtor's insurer. *Helms v. Chandler*, 423 Pa. 77, 80, 223 A.2d ·30, 31 (1976); *Bianco v. Concepts "100", Inc.*, 291 Pa.Super. 458, 462, 436 A.2d 206, 208 (1981). *See also Ryan v. Furey*, 437 Pa. 96, 262 A.2d 305 (1969). The insurer's liability as garnishee is based upon the insurer's breach of the insurance contract with its insured, the judgment debtor. *Bianco v. Concepts "100", supra* (citing *Ryan v. Furey, supra* at 103, 262 A.2d at 309). As garnishor, Butterfield is required to establish two things: (1) the judgment in favor of Butterfield and against the insured Trustees,[6] and (2) Lexington's obligation to the Trustees by proving the existence of a policy providing liability coverage for Butterfield's claim of punitive damages. *See Ryan v. Furey, supra; Bianco v. Concepts "100", supra.*

■ In general, the insurer can then assert any defenses against the garnishor that it could assert against its insured. *Ryan v. Furey, supra* at 104, 262 A.2d at 309. Even though coverage may not be excluded by specific terms in the insurance contract, it may be excluded as a violation of Pennsylvania's public policy. *United Services Automobile Association v. Elitzky*, 358 Pa.Super. 362, 369, 517 A.2d 982, 986 (1986), *allocatur denied*, 515 Pa. 600, 528 A.2d 957 (1987) (citing *Nationwide Mutual Insurance Company v. Hassinger*, 325 Pa.Super. 484, 489, 473 A.2d. 171, 173 (1984)). Thus, the insured must show that the policy covers its claim, and then

6. This issue was decided in Butterfield's favor in the underlying trial and may not now be attacked by Lexington. *See Ryan v. Furey, supra* at 103, 262 A.2d at 309. *See also Aetna Life and Casualty Company v. McCabe*, 556 F.Supp. 1342, 1348 (1983) (citing *Renschler v. Pizano*, 329 Pa. 249, 198 A. 33 (1938); *Vaksman v. Zurich General Accident and Liability Insurance Company*, 172 Pa.Super. 588, 94 A.2d 186 (1953)) (explaining that insurers are collaterally estopped from litigating issue decided in underlying case so long as insurer had notice of the case and an opportunity to defend).

the burden shifts to the insurer to establish an exclusion. *Erie Insurance Exchange v. Transamerica Insurance Company,* 516 Pa. 574, 580, 533 A.2d 1363, 1366 (1987) (quoting *Miller v. Boston Insurance Company,* 420 Pa. 566, 570, 218 A.2d 275, 277 (1966)); *Keystone Automated Equipment Company, Inc. v. Reliance Insurance Company,* 369 Pa.Super. 472, 477, 535 A.2d 648, 650 (1988), *allocatur denied,* 519 Pa. 654, 546 A.2d 59 (1988) (citing *Miller v. Boston Insurance Company, supra* ).

Instantly, Lexington argues that punitive damages are not covered under its umbrella policy. Secondly, Lexington proffers, even assuming, *arguendo,* that the policy does cover punitive damages, they are excluded from coverage in Pennsylvania as against public policy. Thirdly, Lexington maintains that even if vicariously imposed punitive damages are insurable, Butterfield has the burden of proving coverage and is foreclosed from doing so because it is impossible to determine the basis for the jury's award against HUP. Finally, Lexington asserts that even if it had the burden of proving that punitive damages were directly awarded against HUP, Lexington has more than met that burden based upon the record below. We cannot agree.

## III. THE INSURANCE POLICIES

The question of whether an insurer has the duty to indemnify depends upon the type of claim at issue. *Solcar Equipment Leasing Corporation v. Pennsylvania Manufacturers' Association Insurance Company, supra* (citing *Creed v. Allstate Insurance Company, supra* ). The construction of an insurance policy is a question of law over which we need not defer to the trial court's findings.[7] *American States Insurance Company v. Maryland Casualty Company,* 427 Pa.Super. 170, 181, 628 A.2d 880, 886 (1993) (citing *United Services Automobile Association v. Elitzky, supra* at 368, 517

---

7. Instantly, the trial court did not reach this issue as it determined that Butterfield could not meet its burden of proving that the punitive damages were assessed vicariously against HUP, and, therefore covered under the policy as a matter of law. For the reasons discussed herein, the trial court erred in placing that burden on Butterfield.

A.2d at 985). The principles to be applied in reviewing an insurance contract are well settled.

> When interpreting an insurance contract, words that are clear and unambiguous must be given their plain and ordinary meaning. Where ambiguities are found, they must be construed in the light most favorable to the insured. However, 'a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction.' An ambiguity exists only when a policy provision is reasonably susceptible of more than one meaning.[8] ... Whether a policy provision is ambiguous is a question of law to be decided by the courts.

*Ryan Homes v. Home Indemnity, supra* at 346–47, 647 A.2d at 941 (citations omitted). *See also American States Insurance v. Maryland Casualty, supra* at 181, 628 A.2d at 886 (citing *Standard Venetian Blind Company v. American Empire Insurance Company*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1984)); *United Services Automobile Association v. Elitzky, supra* at 368–69, 517 A.2d at 985–86 (citation omitted). In order to decide whether a claim comes within the insurance policy's coverage, we must first ascertain the policy's scope. *Britamco Underwriters, Inc. v. Weiner,* 431 Pa.Super. 276, 280, 636 A.2d 649, 651 (1994), *allocatur denied,* 540 Pa. 575, 655 A.2d 508 (1994) (citing *Dibble v. Security of America Life Insurance Company,* 404 Pa.Super. 205, 210, 590 A.2d 352, 354 (1991)). Moreover, the proper focus of this scrutiny is the

8. Moreover, if a policy is reasonably susceptible of two interpretations, it must be construed in the insured's favor so as not to defeat, unless clearly necessary, the claim to indemnity which the insured intended to obtain. *Blue Anchor Overall Company v. Pennsylvania Lumbermens Mutual Insurance Company,* 385 Pa. 394, 397, 123 A.2d 413, 415 (1956) (quoting *Armon v. Aetna Casualty and Surety Company,* 369 Pa. 465, 468, 87 A.2d 302, 303 (1952)); *J.H. France Refractories Company v. Allstate Insurance Company,* 396 Pa.Super. 185, 193, 578 A.2d 468, 472 (1990), *modified,* 534 Pa. 29, 626 A.2d 502 (1993); *Dauphin Deposit Trust Company v. World Mutual Health and Accident Insurance Company of Pennsylvania,* 206 Pa.Super. 406, 410, 213 A.2d 116, 118 (1965). *See also Vale Chemical Company v. Hartford Accident and Indemnity Company,* 340 Pa.Super. 510, 521, 490 A.2d 896, 902 (1985), *rev'd on other grounds,* 512 Pa. 290, 516 A.2d 684 (1986) (citation omitted) (in construing policy's coverage of liability, court's objective must be to give effect to policy's dominant purpose of indemnity).

reasonable expectations of the insured at the time of purchase. *Id.; Vale Chemical Company v. Hartford Accident and Indemnity Company,* 340 Pa.Super. 510, 522, 490 A.2d 896, 902 (1985), *rev'd on other grounds,* 512 Pa. 290, 516 A.2d 684 (1986) (citing *Collister v. Nationwide Life Insurance Company,* 479 Pa. 579, 388 A.2d 1346 (1978), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979); *Blue Anchor Overall Company v. Pennsylvania Lumbermens Mutual Insurance Company,* 385 Pa. 394, 123 A.2d 413 (1956)).[9] In determining the insured's reasonable expectations, we must examine the totality of the insurance transaction involved. *Britamco Underwriters, Inc. v. Weiner, supra.*

 In this case, the Lexington policy is a "Following Form–Excess Policy." Therefore, the coverage provided by the INA primary policy defines the scope of coverage for malpractice liability. The pertinent portions of the INA policy provide:

I. Coverages

With respect to coverages A, B, C, D, E, G and H, the Company agrees to pay on behalf of the Insured *all sums*

---

**9.** In *J.H. France Refractories Company v. Allstate Insurance Company, supra,* an *en banc* panel of this Court explained:

> If a party purchases liability insurance, that party has a reasonable expectation that it will be provided indemnification for liability imposed upon it. Although the exact scope of the protection purchased may require reference to the policy, and it may not be reasonable to expect complete freedom from liability simply because insurance has been purchased, any inclusion of provisions or interpretation of such provisions that seems to insulate the insurer from liability or to otherwise reduce the scope of coverage, which the policy as a whole purports to extend, would have to be viewed with great skepticism, lest the very nature of the contractual relationship become an illusion.
>
> Surely, an insurer cannot purport to provide liability coverage, collect premiums for coverage, and then expect proffered interpretations of key provisions which would have the effect of greatly reducing or eliminating indemnification for liability to be seriously entertained by the courts. The insurer simply must understand that when it holds itself out as a provider of insurance coverage, offers insurance protection and accepts a premium for such coverage, it will be made to provide such coverage within reasonable bounds of construing the policy in question.

*Id.* at 195–96, 578 A.2d at 473.

*which the Insured shall become legally obligated to pay* with respect to occurrences during the policy period:

\* \* \* \* \* \*

D. Malpractice Liability

*As damages because of injury, including death,* sustained by any person, or property *arising out of:*

1. *Malpractice, error or mistake* committed during the policy period:

a. *In rendering or failing to render* to such person or animals, or to the person inflicting the injury, *medical,* surgical, dental, nursing, tonsorial or cosmetic massage service or *treatment* ...

(emphasis added).

We conclude that the policy is ambiguous because this language neither specifically includes nor excludes coverage for punitive damages. *Compare Creed v. Allstate Insurance Company, supra* at 142, 529 A.2d at 12 (holding "We will pay all sums arising from the same loss which an insured person becomes legally obligated to pay as damages because of bodily injury or property damage ..." language in a homeowner's policy did not include punitive damages) *with Esmond v. Liscio,* 209 Pa.Super. 200, 212, 224 A.2d 793, 799 (1966), *allocatur denied* (1967) (holding "The company will pay on behalf of the insured *all sums* which the insured shall become *legally obligated to pay as damages* because of A. Bodily injury \* \* \* caused by accident ..." language in an automobile policy did not expressly exclude punitive damages). We need not determine here whether the damages are included or excluded because the Lexington policy contains a separate endorsement which provides:

### PUNITIVE DAMAGES AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby warranted by the Insured that none of the policies listed in the Schedule of Underlying Insurance contain any exclu-

sion(s) of any fines, penalties, punitive or exemplary damages.

It is further agreed that should any policy listed in the Schedule of Underlying Insurance or any renewal or replacement thereof be amended to exclude or contain any exclusion for any fines, penalties, punitive or exemplary damages, then such coverage as is afforded by this policy shall automatically exclude any fines, penalties, punitive or exemplary damages.

All other terms and conditions remain unchanged.

■ Lexington argues that its umbrella policy excludes coverage for punitive damages under this endorsement because the CAT Fund, an underlying insurer, does not insure for punitive damages claims. Although Lexington listed the CAT Fund in its schedule of underlying insurance, Lexington errs in classifying the CAT Fund as insurance. Rather, the CAT Fund is an executive agency of the Commonwealth statutorily mandated by Article VII of the Health Care Services Malpractice Act,[10] *Judge v. Allentown and Sacred Heart Hospital Center,* 506 Pa. 636, 638 n. 1, 487 A.2d 817, 818 n. 1 (1985), *on remand,* 90 Pa.Cmwlth. 520, 496 A.2d 92 (1985), to compensate victims of a tort or breach of contract by a health care provider in Pennsylvania. *See American Casualty Company v. PHICO Insurance Company,* 537 Pa. 295, 643 A.2d 91 (1994) (excluding CAT Fund coverage from Court's discussion of insurance policies' order of application); *DeVeaux v. Palmer,* 125 Pa.Cmwlth. 631, 558 A.2d 166 (1989) (explaining CAT Fund is not an independent insurance carrier but an executive agency of Commonwealth in claim for interference with performance of contract); *Finkbiner v. Medical Professional Liability Catastrophe Loss Fund,* 119 Pa.Cmwlth. 243, 546 A.2d 1327 (1988), *affirmed,* 523 Pa. 101, 565 A.2d 157 (1989) (holding CAT Fund is not private insurer but rather Commonwealth agency and, therefore, cannot be liable for bad faith refusal to settle case). Thus, we need not reach the issue of the CAT Fund's liability for punitive damages in this case.

**10.** 40 Pa.S. § 1301.701 *et seq.*

Finding no exclusion for punitive damages in the underlying insurance policy, we hold that the Trustees reasonably expected to be covered for a punitive damages claim and were so covered under Lexington's insurance policy provisions. Butterfield has met its burden to show coverage of its claim; therefore, the burden now shifts to Lexington to prove an exclusion. *See Ryan v. Furey, supra; Bianco v. Concepts "100", supra.* There being no exclusion for punitive damages in the policies themselves, Lexington argues that punitive damages are excluded as against public policy in Pennsylvania.

## IV. PUBLIC POLICY ON PUNITIVE DAMAGES

### A. Direct Liability

In Pennsylvania, punitive damages are awarded to deter and punish a tortfeasor's egregious behavior. *Martin v. Johns–Manville Corporation,* 508 Pa. 154, 169, 494 A.2d 1088, 1096 (1985), *rev'd on other grounds,* 515 Pa. 377, 528 A.2d 947 (1987) (citations omitted); *Creed v. Allstate Insurance Company, supra* at 141, 529 A.2d at 12; *Esmond v. Liscio, supra.* Punitive damages may be based on conduct that is outrageous either because of a defendant's evil motive or his reckless indifference to the rights of others. *Martin v. Johns–Manville Corporation, supra* (quoting Restatement (Second) of Torts § 908(2)); *Creed v. Allstate Insurance Company, supra.* For these reasons, this Court has held that a claim for punitive damages against a tortfeasor who is *personally* guilty of outrageous and wanton misconduct is excluded from coverage as a matter of law. *Aetna Casualty and Surety Company v. Roe, supra* at 425, 650 A.2d at 100 (citing *Creed v. Allstate Insurance Company, supra; Pennbank v. St. Paul Fire and Marine Insurance Company,* 669 F.Supp. 122, 125 (W.D.Pa. 1987) (quoting *Esmond v. Liscio, supra* at 215, 224 A.2d at 800)).

### B. Vicarious Liability

In 1987, a Pennsylvania federal district court stated in *Pennbank v. St. Paul Fire and Marine Insurance Company, supra,* that "Pennsylvania does not preclude recovery of puni-

tive damages from an insurer where the insured is only vicariously liable for such damages." *Id.* at 125 (citing *Esmond v. Liscio, supra* ). Relying on *Esmond v. Liscio, supra,* the federal court explained:

[w]here corporate management commits an outrageous act, punishment is appropriate. Where the act is committed by ... an agent, not pursuant to corporate policy or plan, the corporation, though vicariously liable for punitive damages, is entitled to insure against such damages. We believe this holding to be consistent with *Esmond v. Liscio* and the underlying public policy.

*Id.* at 126. In both *Esmond v. Liscio, supra,* and *Pennbank v. St. Paul Fire and Marine Insurance Company, supra,* however, the respective courts held that the exception against recovering punitive damages from the insurer when the insured is only vicariously liable did not apply to the facts of either case.

Although no Pennsylvania appellate court has ruled on this precise question with the proper facts before it, we are also guided in our decision-making by other courts which have held insurers liable for indemnifying punitive damages based on vicarious liability, whereas insuring punitive damages based on direct liability is precluded. *See e.g. Commercial Union Insurance Company v. Ramada Hotel Operating Company,* 852 F.2d 298 (7th Cir.Ind.1988); *Independent Petrochemical Corporation v. Aetna Casualty and Surety Company,* 654 F.Supp. 1334 (D.C.Cir.1986), *cert. denied,* 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992); *U.S. Concrete Pipe Company v. Bould,* 437 So.2d 1061 (Fla.1983); *Dayton Hudson Corporation v. American Mutual Liability Insurance Company,* 621 P.2d 1155 (Okla.1980); *Scott v. Instant Parking, Inc.,* 105 Ill.App.2d 133, 245 N.E.2d 124 (1st Dist.1969); *Malanga v. Manufacturers Casualty Insurance Company,* 28 N.J. 220, 146 A.2d 105 (1958); *Ohio Casualty Insurance Company v. Welfare Finance Company,* 75 F.2d 58 (8th Cir.1934), *cert. denied,* 295 U.S. 734, 55 S.Ct. 645, 79 L.Ed. 1682 (1935). *See also Perl v. St. Paul Fire and Marine Insurance Company,* 345 N.W.2d 209 (Minn.1984) (holding insurer liable to indemni-

fy in forfeiture of fee for malpractice case based on vicarious liability of law firm and comparing public policy to that of insuring punitive damages based on vicarious liability). In both *Commercial Union Insurance Company v. Ramada Hotel Operating Company, supra,* and *U.S. Concrete Pipe Company v. Bould, supra,* the respective courts held that the insurer had the burden of proving that the punitive damages were excluded from coverage as well as the burden of establishing that the liability was direct.

Based upon the foregoing reasons, we hold that Pennsylvania public policy does not preclude recovery of punitive damages where the insured is only vicariously liable for the damages. Therefore, Lexington had a duty to indemnify its insured, the Trustees, for punitive damages awarded on the basis of vicarious liability.

 Butterfield acknowledges that it is impossible to confirm the basis of the jury's findings of punitive damages because no one submitted specific interrogatories. Lexington, however, asserts that although it is impossible for Butterfield to determine the basis for the jury's award, Lexington has more than met its burden based upon the record. In an effort to support its assertion, Lexington points to the "devastating attack" Butterfield mounted on HUP's failure to utilize any written guidelines or protocols to govern the administration of Alkeran.[11] Lexington also directs our attention to the following jury instructions by the Honorable Curtis Carson:

> Members of the jury, the defendant Hospital of the University of Pennsylvania has an *independent duty* to its patients to supervise the practice of medicine in its facility. This means that the defendant hospital, *as a corporate entity,* had a duty owed to the plaintiff, Kathy Butterfield, to manage and coordinate delivery of her medical care.

> Members of the jury, the *defendant Hospital of the University of Pennsylvania has a duty* under the law of this Commonwealth to have comprehensive policies and stan-

11. Lexington Brief at 2.

dards for ensuring the safety of patients and for the protection against malpractice and negligence in its institution. Members of the jury, the bylaws and Trustees of the Hospital of the University of Pennsylvania and of the medical staff bylaws of the University of Pennsylvania provide that care to a patient is to be provided by an attending physician, medical care provided by a fellow such as Dr. Benrubi and Dr. Rubin is to be provided under the supervision of an attending physician. *If you find that based on the evidence, the treatment of Kathy Butterfield was inconsistent with those requirements as stated in the bylaws of the Hospital of the University of Pennsylvania and the Pennsylvania Code, then you may find the Hospital of the University of Pennsylvania was also liable for any negligence which may have occurred in the treatment of Kathy Butterfield.*

\* \* \* \* \* \*

Now, then you consider, too, the fact that *the University of Pennsylvania Hospital exercised control to the extent that they should have and that there should be some standards, written standards for the training and supervision* of fellows in training, who were experts themselves to an extent. *Consider the University of Pennsylvania Hospital, the type of institution it is, and you may bring in an amount that you feel would deter this type of conduct in the future.*

(R. 659a–663a) (Emphasis added).

Conversely, Butterfield submits the following instructions to support its contention that the punitive damages were awarded based on vicarious liability:

*The hospital operates not as an individual, it operates as an entity through individuals; and therefore their liability arises from the conduct of those persons who are its agents. They are in turn the principals.*

\* \* \* \* \* \*

Members of the jury, *if you find* that Dr. Benrubi, Dr. Rubin, and even Nurse Berganzt—and she is not a defendant in this case—*were employees or agents of the Universi-*

*ty of Pennsylvania Hospital* and that they were negligent in their care and treatment of Kathy Butterfield and, as I said to you, this negligence was a substantial factor in causing the injuries sustained by Miss Butterfield or increased her risk, which was a substantial factor in creating the condition which led to her death, *then you have a right to find, you can find the University of Pennsylvania Hospital also negligent.*

Now, remember I said to you that Dr. Mangan is not a defendant in this case but he is a part of the Gynecologic–Oncology group and also *he is an agent or if you find that he was an agent of the University of Pennsylvania Hospital from the testimony in this case.* Now, some of the circumstances that you are to consider in that connection in determining whether or not an agency relationship existed was that he was on a salary, that he had his office in the hospital, that he had hospital privileges, and that he was an integral part of this hospital, that is, he was in fact in charge of a division within the Gynecologic–Oncology group, and I believe the testimony was chemotherapy, that he was in charge of the Chemotherapy Division. If you find that he was negligent either in his act or omission or commission— because, you see, negligence can be either doing something that a reasonably prudent person wouldn't do under these circumstances or the failure to do something that a reasonably prudent person would do, *if you feel that he was negligent in that regard, that can be ascribed to the University of Pennsylvania Hospital.*

*This is all in respondeat superior, what we call superior relationship. That is, a person who is my agent does an act that injures a third party and that person is in the course of my business, doing something for me, does an act which causes an injury to a third party, I can be sued as his principal and he as my agent can also be sued. And the fact that a judgment is rendered against him, the same judgment can be rendered against me.*

\* \* \* \* \* \*

*Now, if you find that any of the persons, the doctors involved, and they were the agents of the hospital, and you find that the agents' conduct was outrageous, that it was exceedingly reckless, then you may bring in a sum against the principal, which would be the University of Pennsylvania Hospital.* The statement is that if you find this outrageous conduct was a substantial factor in bringing about the harm the plaintiff is alleged to have suffered, and you find that the conduct was outrageous, *you may award punitive damages in addition to compensatory damages.*

(Trial Transcript, November 20, 1984 at 1746–50, 1764). (Emphasis added).

Based on these jury instructions, we conclude that the jury could have found HUP either directly negligent, vicariously negligent, or both in Kathleen Butterfield's diagnosis, treatment, or care. Both Lexington and Butterfield direct our attention to the percentages of negligence the jury assigned to HUP and its doctors in support of their respective theories. Lexington proffers that the jury would have assigned one hundred percent negligence among the doctors had they found HUP only vicariously liable under *respondeat superior.* Conversely, Butterfield maintains that the jury's assignment of fifty/fifty negligence between the doctors and HUP fully supports its theory of vicarious liability as the sole basis for the award. We find neither argument conclusively persuasive.[12] Because Lexington had the burden to prove that the punitive damages award was excluded from coverage as a matter of law, Lexington had the burden to show that the jury assessed the punitive damages solely on the basis of direct liability. *See Erie Insurance Exchange v. Transamerica Insurance Company, supra; Keystone Automated Equipment Company v. Reliance Insurance Company, supra.* Thus, the trial court

12. We also reject Butterfield's argument that a parent entity is vicariously liable as a matter of law because the Trustees were not named as a defendant but were merely financially responsible for the judgment entered against its subsidiary. We adopt the trial court's analysis that the "Trustees were merely stepping into the shoes of HUP in assuming liability as the parent entity." (Trial Court Opinion, filed June 15, 1994, at 9 n. 3).

erred in granting summary judgment for Lexington. We hold that Lexington cannot sustain its burden as a matter of law. Therefore, summary judgment must be granted in favor of Butterfield.

## V. NOTICE AND OPPORTUNITY

Lexington's excess insurance policy was worded broadly enough to create potential coverage of a claim for punitive damages.[13] Lexington was on notice from *Esmond v. Liscio, supra,* that punitive damages assessed on vicarious liability may be insurable under Pennsylvania law.[14] Lexington's own broker notified the insurer that the broker's position was that punitive damages based on vicarious liability would be covered under the Lexington policy. Finally, the Trustees put Lexington on notice that they would be seeking indemnification for any punitive damages based on the Lexington policy and the consideration the Trustees paid for that policy.

Lexington had the right to participate in the underlying case pursuant to the terms of the respective policies. Counsel for Lexington was present in the courtroom every day of the trial. The trial court allowed Lexington's counsel to attend all discussions held in chambers between the parties. Moreover,

---

**13.** The insurance company could have written its contract so as to specifically exclude punitive damages; but as it did not, it is bound to a strict construction of the terms of the instrument which it drafted.

**14.** In *Royal Indemnity Company v. City of Philadelphia,* 1 P.C.R. 110 (Philadelphia County 1977), the Philadelphia County Court of Common Pleas adopted the exception reasoning of *Esmond v. Liscio, supra,* and held Royal Indemnity liable for the punitive damages assessed vicariously against the City of Philadelphia for the negligent acts of City employees. In that case, as here, the jury found the City negligent in their answers to interrogatories. The trial court determined, however, that the negligence could only have been through vicarious liability. Although *Royal Indemnity Company v. City of Philadelphia, supra,* is not precedent for this Court, its holding is precedent for the Philadelphia County Court of Common Pleas, wherein this garnishment action originated. *See Yudacufski v. Commonwealth, Department of Transportation,* 499 Pa. 605, 612, 454 A.2d 923, 926 (1982) (explaining that absent compelling circumstances, a judge should follow established law of that judicial district). We note that the Honorable Abraham J. Gafni would have applied that same reasoning but for an error in the trial court's analysis of which party had the burden to show how the jury assessed the damages. *See* Trial Court Opinion at 7.

counsel was in regular contact outside of court with the defense attorneys handling the case. In essence, Lexington fully participated in this case short of entering their appearance. Furthermore, Lexington was in the best position to request specific interrogatories as it was their important issue of indemnification at stake. It was up to Lexington to determine whether specific interrogatories should be submitted. Having elected not to do so, Lexington is in no position now to claim that "Lexington's attorney was, at best, an observer and not a participant. . . ." Lexington's Brief at 28.

While in court, in chambers, or through the defense attorneys handling the case, Lexington had the opportunity to request specific instructions on the question, specific interrogatories, or special verdict forms. Moreover, if necessary, Lexington had the option to intervene.[15] Yet, Lexington did not pursue any means available to them at the outset of the trial, during the trial, or immediately following the verdict in order to definitively determine its duty to indemnify the Trustees. Lexington's cavalier approach to the legal proceedings was risky because Lexington had the opportunity to resolve the issue by submitting specific instructions, specific interrogatories before or immediately after the verdict, or by seeking intervention, yet declined to do so based on its own independent assessment of the law. *See Stidham v. Millvale*

---

**15.** Rule 2327 provides in pertinent part:

> At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if
>
> > (1) the entry of a judgment in such action or the satisfaction of such judgment will impose any liability upon such person to indemnify in whole or in part the party against whom judgment may be entered;

Pa.R.Civ.P. 2327(1). *See also Commonwealth v. Keystone Mutual Casualty Company*, 366 Pa. 149, 76 A.2d 867 (1950) (holding court may permit intervention by "interested parties" where purpose of intervention is to protect parties' interest and because proceeding may impose liability on them); *Holloran v. Larrieu*, 431 Pa.Super. 558, 637 A.2d 317 (1994) (holding employer entitled to intervene in employee's medical malpractice action where employer had equitable right of subrogation); *Egenrieder v. Ohio Casualty Group*, 399 Pa.Super. 86, 581 A.2d 937 (1990), *allocatur denied*, 527 Pa. 624, 592 A.2d 44 (1991) (explaining burden of proof necessary to support petition to intervene).

*Sportsmen's Club, supra* (holding insurer was estopped from contending insured's claim fell outside of policy coverage based on expected or intended exclusion where insurer had opportunity to litigate issue of insured's intent in declaratory judgment action).

## VI. CONCLUSION

Because Lexington had the burden of proving that the Trustees' claim was excluded from coverage under the Lexington policy, and Lexington cannot meet that burden as a matter of law, we hold that summary judgment must be granted in favor of Butterfield. Accordingly, we reverse the order granting summary judgment to Lexington and remand the matter for proceedings consistent with this opinion.

Order reversed. Jurisdiction relinquished.