# Dean v. Community Medical Center

C.P. of Lackawanna County, no. 99-CV-4708.

*Joseph P. Lenahan* and *Anthony P. Trozillo,* for plaintiff.

*Michael P. Perry,* for defendant Community Medical Center.

*David W. Saba* and *Laura J. Endler,* for defendants Dressel and Scranton Cardiovascular.

*Robin B. Snyder,* for defendant Lawrence.

*James M. Howley* and *James A. Doherty,* for defendants Serine and Alocci.

*Mark T. Perry,* for defendants Rigau and Falcon.

NEALON, *J.,* May 15, 2000—Several physicians who have been named as defendants in this wrongful death lawsuit have demurred to the punitive damages claims filed against them. Since the alleged actions of those defendants, Christopher J. Dressel Jr. M.D., Scranton Cardiovascular Group Inc., Saul Rigau D.O., and John G. Falcon M.D., do not constitute willful, wanton or reckless behavior, the preliminary objections will be granted

and the exemplary damages claims filed against those parties will be dismissed.

## FACTUAL BACKGROUND

The estate and personal representatives of the decedent, Ann M. Dean, have instituted this medical negligence proceeding seeking to recover compensatory and punitive damages against a host of health care providers who formerly treated the decedent. According to the allegations of the complaint which must be accepted as true for purposes of considering the instant preliminary objection, Dean suffered a myocardial infarction in 1987 for which she underwent angioplasty and thrombolytic therapy. Dean experienced a second myocardial infarction in 1991, as a result of which she sustained "heart valve damage" that increased her risk of bacterial endocarditis. Defendant, Christopher J. Dressel Jr. M.D., of Scranton Cardiovascular Group Inc., treated Dean following her second myocardial infarction and reportedly "made a very strong recommendation to [Dean's] family physician, Dr. Maxwell, that [Dean] should undergo SBE prophylactic antibiotics before any type of future invasive and/or surgical procedure, even dental work, to prevent any bacterial infection of her damaged heart valve." (See plaintiff's complaint, ¶¶16-19.)

Seven years later, Dean was examined by defendant, Enrico Serine M.D., in August 1998 at a time when Dr. Serine practiced medicine with defendant, Michael Alocci M.D., and defendant, Salvatore Lawrence Jr. M.D. (*Id.*, ¶¶5-8, 20.) After a stress test and EKG were performed and revealed coronary artery disease, Dr. Serine

referred Dean to Dr. Dressel and SCG Inc. (*Id.,* ¶¶21-23.) On September 28, 1998, Dr. Dressel performed a cardiac catheterization procedure at defendant, Community Medical Center, which apparently identified three blockages that Dr. Dressel repaired via angioplasty and stent replacement. Dean contends that contrary to his recommendation seven years earlier, Dr. Dressel neglected to administer SBE prophylactic antibiotics prior to performing that procedure. (*Id.,* ¶¶25-28.)

Dean further maintains that although she developed bleeding at the site of the catheter insertion, she was discharged by Dr. Alocci from CMC on September 30, 1998. (*Id.,* ¶¶30-31.) On October 12, 1998, Dr. Serine referred Dean back to Dr. Dressel after her blood work indicated that she was anemic. Dr. Dressel allegedly diagnosed a "pseudo-aneurysm at the site of the catheter insertion from the September 29, 1998 heart catheterization" and admitted Dean to the Mercy Hospital for two days to "treat this condition with compression by the Mercy Hospital ultrasound unit." Dean asserts that her pseudo-aneurysm further increased the risk of developing bacterial infection or endocarditis. (*Id.,* ¶¶34-36.)

On October 20, 1998, Dr. Dressel performed a second cardiac catheterization at the CMC which included "a circumflex coronary angioplasty with rotorblade and stent placement." (*Id.,* ¶¶39-40.) Once again, SBE prophylactic antibiotics were not administered before that procedure and Dean later developed another pseudo-aneurysm. (*Id.,* ¶¶40-41.) Despite the fact that Dean experienced an "elevated temperature and neutrophilia with an elevated neutrophilia count" indicative of a potential bacterial infection, Dr. Dressel and the attending physicians dis-

charged Dean from the CMC on October 22, 1998. (*Id.,* ¶¶43-44.)

On October 24, 1998, Dean contacted Dr. Lawrence with complaints of a fever, chills, nausea and lethargy and was advised by Dr. Lawrence to report to the CMC emergency department. (*Id.,* ¶¶45-47.) At that time, Dean was examined by the CMC emergency room physician, defendant, Saul Rigau D.O., "who made a provisional diagnosis of acute fever and viral syndrome" and discharged her from the CMC. Dean contends that Dr. Rigau should have admitted her "to the hospital with a diagnosis of endocarditis and implemented an intravenous course of penicillin in combination with gentamycin." (*Id.,* ¶¶49, 55.)

Dean avers that she contacted the office of Drs. Lawrence, Serine and Alocci on October 26, 1998, October 29, 1998, and October 30, 1998, but "was denied an appointment" since she was "advised by the office staff that the office was overbooked." (*Id.,* ¶¶59, 61.) On October 30, 1998, she began to experience redness, soreness and puffiness around her right ankle and was eventually examined by Dr. Alocci on November 2, 1998, who diagnosed her ailment as gout. (*Id.,* ¶¶61-63.) Dean submits that Dr. Alocci misdiagnosed her condition at that time since her "symptoms as they were related to her right ankle was [sic] probably streptococcus or bacterial infection which had spread to her joints." (*Id.,* ¶64.) Following a telephone call to Dr. Alocci's office on November 5, 1998, Dean was instructed to present herself to the CMC emergency room where she was examined by defendant, John G. Falcon M.D. (*Id.,* ¶¶68-72.)

Dean maintains that Dr. Falcon failed to review her prior medical records, neglected to order diagnostic testing on a timely basis and did not promptly refer her to an infectious disease specialist. (*Id.,* ¶¶73-75.) Dr. Falcon reportedly diagnosed Dean's condition as "febrile illness, possible sepsis, possible endocarditis, cerebral infarction, and hypokalemia" and CT scans performed at that time allegedly revealed a "brain bleed." (*Id.,* ¶¶78-81.) Dean died at the CMC three days later on November 8, 1998, and a subsequent autopsy identified the cause of death as a "ruptured bacterial cerebral aneurysm due to acute bacterial endocarditis." (*Id.,* ¶¶82-83.)

In the complaint which is comprised of 143 paragraphs, Dean asserts 12 separate causes of action against the treating health care providers. With respect to Dr. Dressel, Dean alleges that Dr. Dressel was "reckless and grossly negligent" for failing to administer SBE prophylactic antibiotics prior to the cardiac catheterizations, discharging her from the CMC on October 22, 1998, with neutrophilia and "early signs of a bacterial infection," neglecting to timely diagnose "streptococcus causing it to escalate into life-threatening bacterial endocarditis," and "causing multiple pseudo-aneurysm [sic] to develop when performing cardiac catheterizations." (*Id.,* ¶111.) Dean further contends that punitive damages should be assessed against Dr. Dressel since he acted "with a conscious and recklessness [sic] indifference to the safety and health of [Dean]" by failing "to heed his own warning and administer . . . SBE prophylactic antibiotics prior to or after either of the surgical procedures he performed." (*Id.,* ¶112.) In addition to seeking compensatory damages from SCG Inc. based upon a theory

of corporate liability, (*id.,* ¶¶114, 115), Dean also demands punitive damages from SCG Inc. by maintaining that it "is causally negligent for the reckless and grossly negligent acts of defendant Dressel on the basis of vicarious liability." (*Id.,* ¶¶117-18.)

As to Dr. Rigau, Dean avers that Dr. Rigau is liable for compensatory and exemplary damages for improperly diagnosing Dean's condition, prematurely discharging her from the CMC on October 24, 1998, failing to request an infectious disease consultation, neglecting to review her prior medical records when assessing her condition and failing to timely communicate her diagnostic testing results to her. (*Id.,* ¶120.) Dean advances comparable allegations against Dr. Falcon, (*id.,* ¶125), and asserts that Dr. Rigau and Dr. Falcon are accountable for punitive damages since they acted "with a conscious and reckless indifference to the safety of [Dean]." (*Id.,* ¶¶123, 127.) Similar contentions are made with respect to Dr. Lawrence, Dr. Serine, Dr. Alocci and the CMC. (*Id.,* ¶¶95, 97, 99, 101, 103, 105, 134, 136.)

On January 19, 2000. Dr. Dressel and SCG Inc. filed preliminary objections seeking to strike Dean's punitive damages claims, and on January 26, 2000, Dr. Rigau and Dr. Falcon likewise demurred to the demand for exemplary damages.[1] The parties subsequently filed their respective memoranda of law, and following the comple-

---

1. Drs. Rigau and Falcon also objected to ¶¶120(h)-(i) and 125(h)-(i) of the complaint as overly general and vague, but at the time of oral argument, counsel for Dean and Drs. Rigau and Falcon resolved those objections by stipulation.

tion of oral argument on May 1, 2000, this matter was submitted for a decision.

## II. DISCUSSION

### (A) *Standard of Review*

The core issue presented by a demurrer is whether on the facts averred, the law says with certainty that recovery under the theory alleged is not possible. *Estate of Witthoeft v. Kiskaddon,* 557 Pa. 340, 343 n.1, 733 A.2d 623, 624 n.1 (1999). A demurrer admits all well-pleaded material facts set forth in the complaint, as well as all inferences reasonably deducible from those facts. *Lowther v. Roxborough Memorial Hospital,* 738 A.2d 480, 489 (Pa. Super. 1999). However, the court need not accept the pleader's conclusions of law, unwarranted inferences from facts, opinions, or argumentative allegations. *Wiernik v. PHH U.S. Mortgage Corporation,* 736 A.2d 616, 619 (Pa. Super. 1999).

To sustain a demurrer, it is essential that the complaint demonstrate on its face that the claim being advanced cannot be sustained as a matter of law. *PennDOT v. Wilkinsburg Penn Joint Water Authority,* 740 A.2d 322, 324 (Pa. Commw. 1999). The novelty of a claim or theory in and of itself does not compel the affirmance of a demurrer. *Denton v. Silver Stream Nursing and Rehabilitation Center,* 739 A.2d 571, 575 (Pa. Super. 1999). Furthermore, if a doubt exists as to whether a demurrer should be sustained, that doubt should be resolved in favor of overruling the demurrer. *Estate of Witthoeft, supra; Denton, supra.*

## (B) *Recovery of Punitive Damages in Medical Negligence Litigation*

Pennsylvania courts have always permitted a patient to recover exemplary damages in a medical malpractice case provided that the health care provider's actions are so outrageous as to rise to the level of intentional, willful, wanton, outrageous or reckless conduct. See *Medvecz v. Choi,* 569 F.2d 1221, 1227-30 (3d Cir. 1987); *Hoffman v. Memorial Osteopathic Hospital,* 342 Pa. Super. 375, 383, 492 A.2d 1382, 1386-87 (1985). In 1997, the General Assembly enacted section 812-A of the Health Care Services Malpractice Act, 40 P.S. §1301.101 et seq., which states that "[p]unitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others." 40 P.S. §1301.812-A(a). The HCSMA amendments further clarify that in the context of a medical negligence claim, "[a] showing of gross negligence is insufficient to support an award of punitive damages." 40 P.S. §1301.812A(b). In that regard, section 812-A is simply a codification of well-settled common law governing exemplary damages. See *SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 495, 587 A.2d 702, 705 (1991). Accord *Cochrane v. Clyne,* no. 95-CV-5145, Nealon, J., at pp. 3-5 (Lacka. Cty. December 23, 1999), *petition for review denied,* no. 13 MDM 2000 (Pa. Super. April 19, 2000).

However, section 812-A did substantively modify Pennsylvania law regarding the vicarious liability of a health care provider for punitive damages based upon the conduct of its agent. Our Commonwealth has long

recognized that a principal may be held accountable for punitive damages solely on the basis of vicarious liability provided that the actions of the agent were not beyond the scope of the agency relationship. *Lake Shore & Michigan Southern Railway Co. v. Rosenzweig,* 113 Pa. 519, 534, 6 A. 545, 553 (1886); *Banas v. Matthews International Corporation,* 348 Pa. Super. 464, 494 n.4, 502 A.2d 637, 652 n.4 (1985). Cf. *Butterfield v. Giuntoli,* 448 Pa. Super. 1, 19-20, 670 A.2d 646, 655 (1995), *app. denied,* 546 Pa. 635, 683 A.2d 875 (1996) (although an insurer need not indemnify an insured for punitive damages based on direct liability, an insurer has a duty to indemnify its insured for punitive damages awarded based upon vicarious liability). Such vicarious liability may be imposed even though the agent did not commit the tort at the direction of the principal, or the principal did not ratify the act. *Shiner v. Moriarty,* 706 A.2d 1228, 1240 (Pa. Super. 1998), *app. denied,* 556 Pa. 711, 729 A.2d 1130 (1998). In fact, Pennsylvania has expressly declined to adopt section 909 of the Restatement (Second) of Torts which conditions vicarious liability for punitive damages upon some knowledge or authorization on the part of the principal.[2] See *e.g., Dean Witter Reynolds Inc. v. Genteel,* 346 Pa. Super. 336, 348-49,

---

2. Section 909 limits the recovery of punitive damages against a principal to those cases in which: "(a) the principal or a managerial agent authorized the doing and the manner of the act, or (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act."

499 A.2d 637, 643 (1985), *app. denied,* 514 Pa. 639, 523 A.2d 346 (1987).

Section 812-A(c) has revised that vicarious liability standard as it applies to health care providers and states:

"Punitive damages shall not be awarded against a health care provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct by its agent that resulted in the award of punitive damages." 40 P.S. §1301.812-A(c).

Unlike other provisions of sections 812-A, the vicarious liability amendments to 40 P.S. §1301.812-A(c) were not suspended by the Supreme Court of Pennsylvania. See *Shumek v. Scranton Counseling Center,* 100 Lacka. Jur. 173, 180 (1999). Hence, with the advent of section 812-A and its injection of a scienter element into the respondeat superior equation, a health care provider may not be vicariously liable for exemplary damages unless it had actual knowledge of the wrongful conduct of its agent and nevertheless allowed it to occur.

Under either section 812-A or Pennsylvania case law, punitive damages are not liable for simple or gross negligence, see *Althaus by Althaus v. Cohen,* 710 A.2d 1147, 1159 (Pa. Super. 1998), *app. granted,* 556 Pa. 701, 729 A.2d 1124 (1998), but may be awarded for willful or wanton behavior or "where the defendant's conduct evidences a 'reckless indifference to the rights of others.' " *Taylor v. Albert Einstein Medical Center,* 723 A.2d 1027, 1037 (Pa. Super. 1998), *app. granted,* 559 Pa. 706, 740 A.2d 234 (1999); *Doe v. Dr. Bernard J. Curran,* 45

D.&.C.4th 544 (Lackawanna Cty. 2000). Wanton conduct requires a state of mind in which the tort-feasor realizes the danger to the plaintiff and disregards it to such a degree that "there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong." *Lewis v. Miller,* 374 Pa. Super. 515, 520, 543 A.2d 590, 592 (1988); *Stubbs v. Frazer,* 308 Pa. Super. 257, 260, 454 A.2d 119, 120 (1982). Reckless indifference "means that 'the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' " *McClellan v. Health Maintenance Organization of Pennsylvania,* 413 Pa. Super. 128, 145, 604 A.2d 1053, 1061 (1992), *app. denied,* 532 Pa. 664, 616 A.2d 985 (1992); *Shumek,* 100 Lacka. Jur. at 179.

The well-pleaded facts of the complaint merely accuse Dr. Dressel of erroneous diagnoses and performing invasive procedures without first administering SBE prophylactic antibiotics as he had previously recommended, thereby causing Dean to develop pseudoaneurysms and endocarditis which resulted in her demise. The complaint is also devoid of any indication that Dr. Dressel's principal, SCG Inc. knew of his misconduct and allowed it to occur such that it could be held vicariously liable under section 812-A(c). Dr. Rigau and Dr. Falcon are likewise charged with nonfeasance for misdiagnosing Dean's condition, prematurely discharging her from the hospital and failing to refer her to an appropriate specialist. Even examining those allegations in a light most favorable to Dean, the conduct of those physicians can only be char-

acterized as ordinary negligence, or at most gross malpractice, which cannot serve as the predicate for punitive damages.

The actions of the attending physicians were not so egregious as to rise to the level of willful, wanton or reckless behavior. Compare *Hoffman, supra* (evidence that emergency room physician allowed a Guillain-Barre syndrome patient with neurological paralysis to remain crying, and immobile on the floor for two hours as the physician repeatedly stepped over him and told him that there was nothing wrong, was sufficient to establish the requisite evil motive and reckless indifference for punitive damages); *Medvecz, supra* (anesthesiologist who abandoned a patient on the operating room table and left the operating room to go to lunch without securing a suitable replacement could be liable for exemplary damages to a patient who suffered irreversible paralysis from an anesthesiology complication that developed in his absence). Punitive damages are designed to punish and deter outrageous conduct, *G.J.D. and D.K. by G.J.D. v. Johnson,* 552 Pa. 169, 172, 713 A.2d 1127, 1129 (1998), and Dean has not identified any actions by her health care providers warranting such a penal response. Therefore, the preliminary objections in the nature of a demurrer to the claims for punitive damages will be granted.

## ORDER

And now, May 15, 2000, upon consideration of the preliminary objections of defendants, Christopher J. Dressel Jr. M.D., Scranton Cardiovascular Group Inc., Saul Rigau D.O. and John G. Falcon M.D., the memo-

randa of law submitted by the parties and the oral argument of counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) The preliminary objections in the nature of a demurrer filed by defendants, Christopher J. Dressel Jr. M.D., Scranton Cardiovascular Group Inc., Saul Rigau D.O., and John G. Falcon M.D., are granted;

(2) The punitive damages claims filed by the plaintiff against defendants, Christopher J. Dressel Jr. M.D., Scranton Cardiovascular Group Inc., Saul Rigau D.O., and John G. Falcon M.D., are dismissed; and

(3) Within 20 days of the date of this order, defendants, Christopher J. Dressel Jr., M.D., Scranton Cardiovascular Group Inc., Saul Rigau D.O., and John G. Falcon M.D., shall file a responsive pleading to the complaint.